## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

---

ANNA PEARL MERRITT,

                                    Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY,

                                    Defendant.

DECISION AND ORDER

15-CV-6633-CJS

---

### APPEARANCES

For Plaintiff:                           Catherine M. Callery, Esq.
                                         Empire Justice Center
                                         One West Main Street
                                         Suite 200
                                         Rochester, NY 14614
                                         (585) 295-5727

For the Commissioner:           Peter William Jewett, Esq.
                                         Social Security Administration
                                         Office of General Counsel
                                         26 Federal Plaza, Room 3904
                                         New York, NY 10278
                                         (212) 264-2436

                                         Grace M. Carducci, A.U.S.A.
                                         Kathryn L. Smith, A.U.S.A.
                                         United States Attorney's Office
                                         100 State Street, Fifth Floor
                                         Rochester, NY 14614
                                         (585) 263-6760

### INTRODUCTION

**Siragusa, J.** This case is before the Court on Plaintiff's motion for judgment on the pleadings, May 18, 2016, ECF No. 11, and the Commissioner of Social Security's

("Commissioner") cross-motion also for judgment on the pleadings, Jul. 15, 2016, ECF No. 12. After reviewing the memoranda of law filed by the parties, the Record from the Commissioner, and hearing oral argument, the Court grants the Plaintiff's motion and remands the case.

## BACKGROUND

### *Procedural History*

Plaintiff Anna Merritt ("Merritt") filed an application for Social Security Disability Insurance ("SSDI") and Supplemental Security Income ("SSI") benefits on August 9, 2012. R. 174–87. Merritt was denied these benefits on October 26, 2012, when the Social Security Administration determined she was not disabled under the rules. R. 102–09; *see also* R. 99–101, 256, 260, 633–65.

Merritt filed a request for a hearing before an Administrative Law Judge ("ALJ"), R. 110–11, and a hearing was held on January 23, 2014, in Rochester, New York by video teleconferencing with the ALJ presiding from Falls Church, Virginia. R. 141–64. Merritt and her mother, Frances Merritt, appeared and testified. Merritt was represented by Lynda J. Fisher, an attorney formerly employed by the Empire Justice Center. R. 41–72, 140. A Vocational Expert ("VE"), James Soldner, also testified. R. 72–75. On April 5, 2013, the ALJ issued a decision denying Merritt benefits, finding there were jobs in significant numbers Merritt could perform. R. 18–40.

Merritt filed a timely request for Appeals Council review, R. 15-16, accompanied by a memorandum of law from her representative, R. 264–66. The Appeals Council denied review on August 25, 2015, thereby making the ALJ's decision the Commissioner's final decision in the case. R. 1-6. Merritt commenced this action on October 22, 2015, and seeks judgment.

### *Plaintiff's School & Work History*

Merritt graduated from high school and attended college for two years. R. 52, 207. She trained as a pharmacy technician, R. 52, and from there worked in a management position for twenty-one years at Rite Aid. R. 208, 243, repeated at 250. She was discharged from that position in March of 2009 for violating company policy by ringing up her own purchase. R. 47.

### *Plaintiff's Medical History*

After losing her job, she became depressed. R. 589. She was diagnosed with major depression by her primary care provider in April 2011, and began therapy in July 2011. R. 598, 473. Her primary care physician, Amanat M. Yosha, M.D., recommended medication or referral to mental health, which Merritt declined. R. 597–98. However, in May of that same year, Dr. Yosha prescribed Trazodone and referred Merritt to Strong Behavioral Health. R. 590. Merritt then reported that she had become increasingly depressed since losing her job; she had trouble sleeping, was eating more, was short tempered, and experienced anhedonia.[1] R. 589.

The record contains progress notes chronicling Merritt's continued treatment with therapist Rosemarie Marshall, M.S., LMHC, from August 2011 through September 2012. R. 476-519. In treatment sessions they discussed methods to decrease depression, including exercise and sleep cycle regulation. R. 480–82.

---

[1] "Anhedonia refers to a condition in which one is incapable of experiencing happiness. *Webster's Third New International Dictionary* 84 (1986)." *Walterich v. Astrue*, 578 F. Supp. 2d 482, 496 n.14 (W.D.N.Y. 2008).

By January of 2012, Merritt's mood was improved and she hoped to explore work and retraining options after recovering from her shoulder surgery. R. 488–90. However, on February 6, 2012, Merritt scored 33 on the BDI,[2] which fell within the severe symptom range. R. 491. She continued reporting some decrease in her depression in March 2012, R. 497–98, but in April she reported increased symptoms. Her therapist encouraged her to ask her physician to increase her Trazadone dose. R. 500.

On May 2, 2012, her score on the PHQ-9[3] was 20, falling within the severe symptom range. R. 503. She had been feeling less depressed until she began to experience more medical problems. R. 504. Only July 30, 2012 she scored 22 on the PHQ-9. R. 513.

Merritt's therapist, Rose Marshall, completed a Mental Residual Functional Capacity Assessment on August 21, 2013, which was co-signed by psychiatrist Sue DiGiovanni, M.D., on September 4, 2013. R. 666–67. In the assessment, they indicated that Merritt had severe limitations in her ability to remember locations and work-like procedures, or to understand, remember or carry out detailed instructions. They also specified that she was severely impaired in her ability to maintain attention and concentration for at least two straight hours with at least four such sessions in a

---

[2] The Record does not explain "BDI." It is possibly a reference to the Beck Depression Inventory, "a 21-item self-report instrument intended to assess the existence and severity of symptoms of depression as listed in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders Fourth Edition (DSM-IV; 1994)." Medical University of North Carolina, Department of Family Medicine, Beck Depression Inventory, http://academicdepartments.musc.edu/family_medicine/rcmar/beck.htm (last visited Oct. 6, 2016).

[3] The Record does not explain "PHQ-9." It is possibly a reference to the patient health questionnaire, part of the "primary care evaluation of mental disorders (PRIME-MD®)." Kurt Kroenke, MD, and Robert L. Spitzer, MD, *The PHQ-9: A New Depression Diagnostic and Severity Measure*, Psychiatric Annals 32:9, September 2002, http://www.lphi.org/LPHIadmin/uploads/.PHQ-9-Review-Kroenke-63754.PDF.

workday. Merritt was moderately limited in her ability to (1) understand and remember short and simple (one or two step) repetitive instructions or tasks, (2) ability to carry out short and simple (one or two step) repetitive instructions or tasks, and (3) to make simple work-related decisions. R. 666. The evaluation also noted that:

> The following stressors which are typically encountered in the workplace would, in all likelihood, increase the level of impairment beyond those indicated, above:
>
> Unruly, demanding or disagreeable customers even on an occasional or infrequent basis;
>
> Production demands or quotas;
>
> Demands for accuracy (intolerance of error rates in excess of 5–10%);
>
> Attendance requirements (intolerance of absenteeism beyond 1–2 days per month);
>
> Need to make quick, accurate, independent decisions for problem solving on a consistent basis;
>
> Need to make accurate, independent decisions for problem solving on a consistent basis.

R. 667.

Merritt's representative submitted Strong Behavioral Health Treatment Plans dated January 21, 2013, R. 673–75, and October 28, 2013, R. 670–72, authored by Ms. Marshall. In January, Ms. Marshall assigned a GAF of 51[4] and indicated Merritt had not made progress toward her goal of reducing symptoms of depression. Her most recent PHQ-9 score, dated January 21, 2013, was a 24 and she continued with individual psychotherapy sessions with Ms. Marshall every two to four weeks. R. 674.

---

[4] "The GAF scale indicates the clinician's overall judgment of a person's level of psychological, social, and occupational functioning. The GAF scale ranges from 1 to 100, with a score of 1 being the lowest and 100 being the highest." *Camille v. Colvin*, 104 F. Supp. 3d 329, 342 (W.D.N.Y. 2015), *aff'd*, No. 15-2087, 2016 WL 3391243 (2d Cir. June 15, 2016) (citing *Tremblay v. Colvin*, No. 12-CV-0379 MAT, 2014 WL 4745762, at *4 (W.D.N.Y. Sept. 23, 2014)).

Merritt's representative submitted to the Appeals Council an assessment completed by Merritt's psychiatrist in July of 2014 to. R. 715–17. Dr. DiGiovanni reported Merritt was in a partial hospitalization program for two weeks, which she attended daily. She would then return to outpatient therapy with Rose Marshall, to whom Dr. DiGiovanni deferred for prognosis. Dr. DiGiovanni assigned a current GAF of 38. R. 715. Merritt's prescriptions included Zoloft, Wellbutrin, and Hydroxyzine. Merritt was described by her doctor as depressed and anxious, with a constricted affect. R. 715. The psychiatrist opined Merritt was not able to work due to anxiety and depression. R. 717.

Merritt was examined by consultative psychologist, Tu-Ling Lin, Ph.D., on October 9, 2012. R. 520–24. Dr. Lin opined Merritt would be able to follow and understand simple instructions and perform simple tasks with supervision, but might have difficulty maintaining attention and concentration or a regular schedule. R. 522. Dr. Lin diagnosed major depressive disorder, moderate; and generalized anxiety disorder and recommended continued psychological treatment, as well as medical evaluation and vocational training. R. 523.

"E. Kamin," a "medical consultant" completed various assessments on October 24, 2012, without examining Merritt. R. 633–50. Kamin decided Merritt was not significantly limited in her ability to remember work-like procedures and very short and simple instructions. She was moderately limited in her ability to understand and remember detailed instructions. Merritt would be moderately limited in her ability to accept instructions and respond appropriately to criticism from supervisors; to respond appropriately to changes in the work setting; and set realistic goals or make plans

independently. R. 648.

When Merritt lost her job she also began to suffer from multiple physical problems. She was diagnosed with Diabetes Mellitus in March 2011, R. 601, and hypertension in 2012, R. 540. She had surgery for a rotator cuff tear on her left shoulder, first diagnosed in May 2011. R. 443–72. In 2012 she had an appendectomy and repair of a ventral hernia. R. 387–89, 399–02. Post-operatively, she experienced hypoxia and required oxygen treatment. R. 371–74. She was then diagnosed with obstructive sleep apnea and started on a CPAP machine. R. 59–60, 526, 560. In December 2012, she was admitted to Strong Memorial Hospital with aspirational pneumonitis, and referred for evaluation of esophageal reflux. R. 701–04. She was diagnosed with biliary colic with biliary dyskinesia, for which she was a surgical candidate, and also diagnosed with GERD. R. 693–99.

Merritt was also treated for headaches during her December 2012 admission. R. 705–06. It was not until early 2014 when neurology notes indicated treatment for chronic intractable headaches, R. 708–14, and Merritt testified that her headaches caused her the most pain. R. 57–58.

In September of 2013, Merritt was diagnosed with Deep Vein Thrombosis (DVT) in her left leg. R. 687–92. She was continuing to take Coumadin® for the blood clots, and experienced severe burning sensations in her leg when she tried to walk. R. 60. She was unable to continue several of her other medications because of interactions with the Coumadin, and also had to postpone recommended gallbladder surgery. R. 67, 698. She was then diagnosed with glaucoma. R. 527, 694. A March 6, 2012, report from

Highland Hospital medical imaging indicated that she also experienced uterine myoma.[5] R. 287–88.

In SSA application papers she completed, Merritt described the discomfort and pain that she had while doing daily activities. R. 221–24, 229. She stated she got "very little rest at night," and that she suffered from "pain in stomach, back, neck, shoulder, arm." R. 221. She gained no comfort from changing her sleeping position and reported she constantly tossed and turned. *Id.*

At her hearing, she also testified to back pain that she was experiencing. R. 66–67. Merritt was afraid she was losing her hair as a side effect of some of her medications, and was experiencing dry mouth and possible hearing loss or tinnitus. R. 56–57. She had described her depression as: "I really just don't feel like I'm worth anything." R. 64. She often cried, seemingly for no reason, and had thoughts of hurting herself. R. 65. She described problems with memory and focus, including forgetting her medications and appointments R. 64–65, 227–28. She also wrote that she hardly ever socialized or answered her phone and that she had been outgoing before all of this happened. R. 70, 225. Merritt's mother, Frances, confirmed her daughter's memory problems and testified to the extent she had to help her with daily activities and chores. R. 69–71.

Merritt lived with her twenty-six year old daughter, who also has health issues. Merritt's daughter had a tumor in her pituitary gland, R. 49–50, and had developmental and learning disabilities, for which she received SSI. R. 679. Merritt tried to help her daughter with schoolwork, R. 221, and other activities, and she testified that she would

---

[5] A uterine myoma is also known as a uterine tumor. *Suarez Matos v. Ashford Presbyterian Cmty. Hosp., Inc.*, 4 F.3d 47, 48 (1st Cir. 1993).

like to help her even more instead of her daughter having to help her with household chores. R. 66, 62. Merritt regretted she did not have the power to change. R. 66.

## JURISDICTION AND SCOPE OF REVIEW

Title 42 U.S.C. § 405(g) grants jurisdiction to district courts to hear claims based on the denial of Social Security benefits. Additionally, the section directs that when considering such a claim, the Court must accept the findings of fact made by the Commissioner, provided that such findings are supported by substantial evidence in the record. Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229 (1938). Section 405(g) thus limits the Court's scope of review to determining whether the Commissioner's findings were supported by substantial evidence. *See, Mongeur v. Heckler,* 722 F.2d 1033, 1038 (2d Cir.1983) (finding that the reviewing court does not try a benefits case de novo). The Court is also authorized to review the legal standards employed by the Commissioner in evaluating the plaintiff's claim. *Seil v. Colvin*, No. 15-CV-6275-CJS, 2016 U.S. Dist. LEXIS 34681 (W.D.N.Y. Mar. 17, 2016).

## DISCUSSION

### The ALJ failed to develop the record.

Turning first to the matter of additional medical evidence Merritt submitted as an exhibit to her motion papers, an affidavit from Merritt's counsel indicates that Strong Memorial Hospital was not straightforwardly responsive until counsel made several requests for the records. Merritt has submitted an additional 377 pages of medical records from the University of Rochester Medical Center. These records were not included in the Commissioner's Record. Merritt argues she was regularly attending

therapy appointments throughout 2012 and 2013. The ALJ cited a lack of treatment notes or discussion of history and frequency of therapy from the therapist in his decision as a basis for, *inter alia*, discounting Merritt's testimony of pain, and the seriousness of her headaches. R. 33 ("the undersigned notes that there was no objective evidence in support of any of the findings discussed with the medical source statement. Indeed, no treatment notes were attached to affirm or support their findings, nor was any history and frequency of treatment discussed to support the limitations opined.").

An administrative hearing in a Social Security case is non-adversarial and the ALJ has an affirmative duty to develop the record. *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996). "This duty exists even when the claimant is represented by counsel." *Id*. The medical records in the Commissioner's file indicate some treatment in 2013. The hearing was held in January 2014. The Record did contain hints that pieces were missing. The Treatment Plan dated October 28, 2013, contained this entry: "Treatment Modalities: –Individual psychotherapy for 45 min Q2 to 4 weeks with Rosemarie Marshall. –Case Management with Kelley Balcomb at least twice a month." R. 672. These entries indicated that additional records existed for the remainder of 2013, at least. The records attached to the motion papers show treatment notes from November, December, 2013, and January, February and May 2014.

Knowing that a lack of documentation was problematic in his acceptance of the medical source opinion, the ALJ, could have done what counsel did—contact the University, several times if necessary, to obtain the complete record. *See, e.g., Lark v. Colvin*, No. 1:13-CV-00332(MAT), 2016 WL 1237305, at *3 (W.D.N.Y., March 30, 2016) ("Although the treatment notes contained within the record are relatively sparse, it is

apparent from the record that additional treatment notes likely existed but were not provided to the Administration."). This failure warrants reversal and remand. Because this case will be returning to the ALJ, the Court will address the other errors raised by counsel to provide guidance to the ALJ who rehears the case.

***Merritt's headaches***

The ALJ determined that Merritt's headaches were not severe because she presented "no longitudinal history for [chronic intractable headaches] lasting 12 months or more, and no evidence it is expected to last that long." R. 25. The Record contradicts the ALJ's finding. In an April 29, 2010 visit to her primary care physician, she complained of headaches "almost daily, frontal, pulsating, sharp to dull pain, comes and goes, relieved with ibuprofen, occ photophobia, no exacerbating factors, feels that she knows when [headache] is coming on since it starts as a mild pain, she reports that she has had a migraine, but this is different." R. 617. Dr. Yosha assessed her a suffering from tension headaches, for which he recommended a "[t]rial of Tylenol, reeval at next visit." R. 618. Merritt testified that she had been seeing Dr. Villaneuva for headaches for the prior six months and that she is taking medication for headaches and depression. R. 54. In addition, the medical records counsel obtained from the University have several indications of medical treatment for headaches. *See, e.g.,* Ex. C at 36 ("Headache. Suspect migraine, possible cluster headaches based on recurrence nightly. Will refer to Dr. Raissa Villanueva for further evaluation.") (1/21/2013); 37 ("She notes that she is also light sensitive and still getting daily headaches and pressure.") (1/28/2013); 38 ("She reports her global headaches are 'sharp like a jolt.'") (1/28/2013); 80 (detailed history of headaches reaching back to childhood recorded by Dr. Villanueva, including Merritt's report, "[s]he has about 30 headache days per month.") (5/30/13); 115

("Suspect migraine, possible cluster headaches based on recurrence nightly.") (7/29/2013); 129 ("Her migraines are occurring 3 to 4 times a week now.") (8/23/2013); ("In August, she had 6 migraine days, in September, she had only 8 headache free days and in October thus far, she has had only 6 headache free days.") (10/24/2013); 154 (reports suffering from frequent headaches) (11/4/2013); 164 ("ongoing migraine headaches") (11/26/2013); 174 ("48 year old female with chronic intractable migraine") (1/21/2014); 177 ("She reports her headaches start out as mild in the morning and then build in severity as the day goes on.") (1/27/2014); ("Since her last visit, she has only had 4 headache free days.") (2/20/2014); and 245 ("She is having migraines now 2 to 3 times a week.") (5/29/2014).

Had the ALJ developed the record as was required, he would have seen evidence of headaches for more than 12 months. Therefore, his assessment that Merritt's headaches were not a severe impairment is not supported by the record, and, in fact is contradicted by the full record, of which parties are now aware. This error requires reversal and remand for reconsideration of the ALJ's assessment in light of the additional medical evidence.

Further, as shown by the Commissioner's Q&A 09-036 (yet another guidance document maintained by the Commissioner in addition to the Regulations, Rulings, and POMS), the diagnosis of a migraine headache is "usually established through patients' reported symptoms (pain, photophobia, nausea)." Q&A 09-028 *attached to* Pl.'s Reply Mem. of Law, Aug. 4, 2016, ECF No. 14, *as* ECF No. 14-1. The guidance provided by the Commissioner concerning the diagnosis of migraine headaches contains the following:

> Once other possible causes have been ruled out and a pattern has been established, we consider the foregoing findings reported by a physician to be "signs" that establish the existence of migraine headaches as an MDI.

Q&A 09-036. The evidence in the Record shows that the treating medical professionals were working through ruling out "other possible causes," yet the ALJ seems to have determined that the evidence established Merritt's headaches "were caused by pneumonia and intracranial pressure." R. 705 (12/21/2012). The ALJ's decision, however, does not address the evidence of chronic headaches in 2013 and 2014.

### *Residual functional capacity & treating physician rule*

Aside from certain climbing restrictions, the ALJ determined that Merritt could perform work at the light exertional level. R. 28. The ALJ gave little weight to the opinion of Dr. DiGiovanni, finding that she never treated Merritt. R. 33.

The Record contains a "BH Treatment Plan" signed by Rosemarie P. Marshall, who was not a physician, and by Dr. DiGiovanni the following day. In questioning Merritt, the ALJ asked her whom she primarily saw, the therapist, or the doctor, to which Merritt responded Rosemarie Marshall, the therapist. The actual exchange was as follows:

Q. And where do you get our counseling?

A. At Strong Behavioral Health.

Q. How often are you going there?

A. Two to three times a month.

Q. And who do you see primarily when you're there? Is it usually Ms. Marshall or are you seeing a doctor?

A. I usually see—I see Rose Marshall.

R. 53. In drawing the inference that Dr. DiGiovanni was not treating Merritt, the ALJ necessarily relied on Merritt's answer to his question about whom she *primarily* saw

during her visits. The ALJ, however, did not ask Merritt whether she ever, or never, saw

Dr. DiGiovanni. As this Court observed in *Matejka v. Barnhart*, 386 F. Supp. 2d 198,

206 (W.D.N.Y. 2005):

> When making his assessment of plaintiff's credibility, if the ALJ perceived
> that her testimony contradicted the prior statements in the form, then "the
> interests of fairness and accuracy both should have led him to ask her
> about the perceived inconsistency, rather than simply snap the trap closed
> in his written decision." *Fernandez v. Apfel,* No. 98–CV–6194 (JG), 2000
> WL 271967, *8 (E.D.N.Y. Mar. 7, 2000).

*Matejka v. Barnhart*, 386 F. Supp. 2d 198, 206 (W.D.N.Y. 2005). Much like the situation

in *Matejka*, the ALJ failed to ask follow up questions to ascertain whether Dr. DiGiovanni

was a treating physician, and apparently simply made the assumption she was not

based on Merritt's answer to his imprecise question. This was error.

Further, the ALJ gave little weight to Ms. Marshall's opinion. Despite that she was

not an acceptable medical source pursuant to 20 C.F.R. §§ 404.1513 and 416.913, the

Commissioner's ruling required that her opinion some extra consideration:

> [T]he opinions of non-acceptable medical sources may be used "to show
> the severity of the individual's impairment(s) and how it affects the
> individual's ability to function." *Id.* SSR 06–03p states that an ALJ should
> apply the same factors to analyze the opinion of a non-acceptable medical
> source as would be used to analyze the opinion of an acceptable medical
> source. *Id.* at *6. These factors include:
>
> > (1) how long the source has known and how frequently the source
> > has seen the individual; (2) how consistent the opinion is with the
> > other evidence; (3) the degree to which the source presents
> > relevant evidence to support an opinion; (4) how well the source
> > explains the opinion; (5) whether the source has a specialty or
> > area of expertise related to the individual's impairments; and (6)
> > any other factors that tend to support or refute the opinion.
>
> *Id.* at *4–5. Accordingly, although a nurse practitioner's opinion is not
> entitled to the same weight as a treating physician, these opinions are
> entitled to "some extra consideration," when the nurse practitioner has a
> treating relationship with the patient. *Mongeur,* 722 F.2d at 1039 n. 2; *see
> also Kohler v. Astrue,* 546 F.3d 260, 268 (2d Cir.2008) (finding that the
> ALJ was not required to give controlling weight to the plaintiff's nurse

> practitioner, but should have given her opinion some consideration where the nurse practitioner was the only medical professional available to the plaintiff for long stretches of time). SSR 06–03p further directs that "the adjudicator generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." 2006 WL 2329939, at *6.

*Beckers v. Colvin*, 38 F. Supp. 3d 362, 371 (W.D.N.Y. 2014). The ALJ's decision also does not include an analysis of the BDI score of 33, "which falls within the severe symptom range," R. 491 (2/6/2012), the PHQ-9 score of 20, also within the severe symptom range, R. 503 (5/2/2012), or PHq-9 score of 24, also within the severe symptom range, R. 674 (1/21/2013). The ALJ must consider all the evidence, not just the evidence that supports his conclusions. *Meadors v. Astrue*, 370 Fed. Appx. 179, 185 (2d Cir. 2010) (quoting *Gecevic v. Sec'y of Health and Human Services*, 882 F. Supp. 278, 286 (E.D.N.Y. 1995) (the ALJ "'cannot simply selectively choose evidence in the record that supports his conclusions.'"). The ALJ also relied on evidence from a non-examining physician who reviewed Merritt's records (and evidently not the ones provided by Merritt in Exhibit C), as well as a consultative examiner to support his conclusions. R. 32 ("the undersigned assigns Drs. Kamin and Lin significant weight.").

According to the Commissioner's Ruling,

> Medical source statements submitted by treating sources provide medical opinions which are entitled to special significance and may be entitled to controlling weight on issues concerning the nature and severity of an individual's impairment(s). Adjudicators must remember, however, that medical source statements may actually comprise separate medical opinions regarding diverse physical and mental functions, such as walking, lifting, seeing, and remembering instructions, and that it may be necessary to decide whether to adopt or not adopt each one.

SSR 96-5p (Policy Interpretation Ruling Titles II and XVI: Medical Source Opinions on

Issues Reserved to the Commissioner). The ALJ's decision to accord more weight to Dr. Lin's opinion, who saw Merritt only once, than to the individuals providing ongoing treatment to Merritt, is not supported by substantial evidence in the record, especially considering the evidence that was missing from the Record at the time of the ALJ's determination. This was error. *See Selian v. Astrue*, 708 F.3d 409, 419 (2d Cir. 2013) ("We have previously cautioned that ALJs should not rely heavily on the findings of consultative physicians after a single examination.").

Merritt points out that the vocational expert testified that if Merritt suffered from the limitations found by her treating sources, she would be incapable of holding any job in the competitive market. R. 75. Therefore, because the ALJ did not consider the evidence supporting Merritt's treating sources in arriving at his conclusion, and had he done so he may have determined that she was incapable of employment, the result could have been different. Thus, the ALJ's failures are not harmless error.

The Commissioner argues that any error by the ALJ in failing to designate Merritt's headaches as severe was harmless, because in his residual functional capacity ("RFC") assessment "the ALJ explicitly accounted for" the headaches. Comm'r Mem. of Law 16, Jul. 15, 2016, ECF No. 12-1. The ALJ's RFC assessment limited Merritt to "simple, repetitive, routine, tasks…in a low stress job…." R. 28. Based on Merritt's descriptions of the limitations she suffered during her headaches, and her description of how they grow worse during the day, the ALJ's concession seems scarcely the assessment needed in making an RFC determination that is supported by substantial evidence in the Record.

The Commissioner also argues that Ms. Marshall's and Dr. DiGiovanni's opinion as contained in a form dated August 21, 2013,[6] R. 666–67, and companion letter, R. 668, were properly accorded little weight by the ALJ. Comm'r Mem. 18. The ALJ cited the lack of objective evidence or treatment notes in the actual check-box form and the vagueness of the accompanying letter as a reason for according little weight to the August 2013 opinion. The attached letter, signed by Rose Marshall, LMHC, states:

> With regards to the Mental Residual Functional Capacity Assessment whieh has been completed for Anna Merritt I want you to know that Ms Merritt's mental health symptoms, and lack of resolve of those symptoms, have been impacted greatly by the multiple medical problems that Ms. Merritt has been addressing over the past year. In addition there have been numerus psycho-social stressors that have complicated her situation and have impacted her progress.

R. 668.

Notwithstanding the lack of narrative on the check-box form, the ALJ was still required to consider the opinion. *See Dote-Lowery v. Colvin*, No. 6:14-cv-00570, 2015 U.S. Dist. LEXIS 133441 (N.D.N.Y Oct. 1, 2015) ("It was incumbent upon the ALJ to fill any gap in the record in an attempt to determine the basis of Dr. Mulholland's opinion."). Significant treatment notes exist that predated the August 2013 report that would have permitted the ALJ to assess whether the August 2013 report was supported by the treatment notes. *See* Progress Notes by Marshall, Rosmarie P. at 8/21/2013 3:56 PM, *attached to* Pl.'s Mem. of Law, Ex. C; Progress Notes by Marshall at 10/3/2012; Progress Notes by Marshall at 10/24/2012; Progress Notes by Marshall at 11/12/2012; Progress Notes by Marshall at 11/13/2012; Progress Notes by Marshall at 12/6/2102; and Progress Notes by Marshall at 12/24/2012. The ALJ's failure to develop the Record

---

[6] Ms. Marshall signed the report on August 21, 2013, and Dr. DiGiovanni signed in on September 4, 2013. The report refers to the "attached letter." R. 667.

hindered his assessment of the RFC determination by Merritt's treating medical sources.

### *Credibility*

Merritt testified she was "in pain, generally all the time." R. 53. A large portion of the ALJ's decision discussed Merritt's pain as reflected not only in the testimony, but also in the documentary evidence. R. 24–33. However, the ALJ concluded that Merritt's "evidence does not establish the alleged intensity and severity [of pain] she alleges." R. 33. His decision appears to have been based, at least in part, on the lack of treatment records. As outlined above, the ALJ erred in failing to develop the record further, and in questioning Merritt at the hearing about who was treating her. These failures led to an incomplete picture of Merritt's condition. On remand, the ALJ should consider whether the additional evidence affects the credibility determination.

### CONCLUSION

For the foregoing reasons, the decision of the Commissioner is reversed pursuant to sentence four of 42 U.S.C. § 405(g) and the matter is remanded to the Commissioner for reconsideration in light of this decision and order.

DATED:     October 26, 2016
           Rochester, New York

                              /s/ Charles J. Siragusa
                              CHARLES J. SIRAGUSA
                              United States District Judge